2002 OK CR 36

John Marion GRANT, Appellant,

v.

STATE of Oklahoma, Appellee.

No. D 2000–653.

Court of Criminal Appeals of Oklahoma.

Nov. 18, 2002.

As Modified on Denial of Rehearing Jan. 24, 2003.

James Bowen, Amy McTeer, Indigent Defense System, Capital Trial Division, Sapulpa, OK, Attorneys for Defendant at trial.

Larry Stuart, District Attorney, Keith Sims, Assistant District Attorney, Pawhuska, OK, Attorneys for the State at trial.

William H. Luker, Sandra Mulair Cinnamon, James Lockard, Appellate Defense Counsel, Capital Direct Appeals Division, Indigent Defense System, Norman, OK, Attorneys for Appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, David M. Brockman, Assistant Attorney General, Oklahoma City, OK, attorneys for Appellee on Appeal.

## *OPINION*

LILE, Judge.

¶1 Appellant, John Marion Grant, an inmate at the Oklahoma Department of Corrections (D.O.C.) Connor Correctional Center, was charged with the First Degree (malice) Murder[1] of D.O.C. employee Gay L. Carter in Osage County District Court, Case No. CF–99–28.[2] The State filed a Bill of Particulars alleging three aggravating circumstances: "The defendant was previously convicted of a felony involving the use or threat of violence to the person;" "The murder was committed by a person while serving a sentence of imprisonment on conviction of a felony;" and "The existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."[3] A jury trial was held before the Honorable J.R. Pearman, District Judge. The jury found Grant guilty as charged, found the existence of the

---

1. 21 O.S.1991 § 701.7(A).

2. This crime occurred on November 13, 1998. The trial took place in February and March 2000 with formal sentencing on March 8, 2000. Appellant filed his Petition in Error on November 6, 2000. Appellant's Brief in Chief was filed on August 1, 2001. This Court heard oral argument on April 16, 2002. Final Supplemental briefs after a remanded evidentiary hearing were filed by Appellant on April 5, 2002 and by Appellee on April 17, 2002.

3. 21 O.S.1991, § 701.12(1), (6), & (7).

three aggravating circumstances, and set punishment at Death.

## I. FACTS

¶ 2 On November 13, 1998, Grant savagely and repeatedly stabbed Gay Carter, a food service supervisor at the Connor Correction Center in Hominy, Oklahoma. Grant used a prison-made "shank" similar to a sharpened screwdriver. Grant was serving a total of one-hundred thirty (130) years for four separate armed robberies and had been in prison for about twenty years prior to this offense. On a previous stay at Connor Correctional Center, Grant had worked in the kitchen and he knew Carter; however, Grant lost this job because he was fighting with another inmate.

¶ 3 The morning of and the morning before this murder, Grant and Carter argued over the breakfast tray served to Grant. The previous morning Grant told Carter, "I'll get you bitch," and the morning of the murder Grant stated, "Your mine." Inmates Jerry James and Ronald Kuykendall, who held jobs in the dining area, witnessed these arguments.

¶ 4 After the last argument, James and Kuykendall saw Grant loitering in a storage area where cleaning supplies were kept, adjacent to the main dining area. Carter left the dining area to go to another building where the kitchen was located. When she returned, Grant grabbed her and pulled her into a mop closet. Inside the closet, Grant stabbed Carter numerous times in the chest while holding her mouth closed.

¶ 5 Witnesses summoned Sergeant Daniel Gomez, the first Correctional Officer to arrive. Gomez saw Grant still struggling with Carter. Grant then stood up and faced Gomez, looked at him with a vacant stare, and ran across the dining hall to the storage room, while still carrying the shank in his hand. Grant shut the door, closing himself inside.

¶ 6 After Grant left the mop closet, medical personnel arrived to aid Carter. They found that she was not breathing, and they could not find any vital signs. Carter was transported to the hospital, but efforts to revive her were unsuccessful. Medical Examiner Robert Hemphill determined that Carter died as a result of sixteen stab wounds. Carter's aorta was punctured, causing rapid blood loss resulting in her death.

¶ 7 The storage room to where Grant fled, has a wire mesh ceiling through which Correctional Officer Tony Reeves observed Grant. Grant ignored orders to lie down on the floor. Grant held the shank to his chest and ran into the wall, apparently in an attempt to stab himself. A special team of correctional officers entered the storage room and Grant made stabbing motions toward the officers. The officers were able to subdue Grant with the use of an electrical shock device.

¶ 8 Grant raises fifteen propositions of error in his appeal. These propositions will be addressed as they arose at trial.

## II. JURY SELECTION ISSUES

### A.

¶ 9 Grant claims, in his first proposition, that the trial court committed reversible error by improperly denying his challenges for cause against two jurors who expressed a reluctance to consider all three punishment options. He claims that he was forced to accept other objectionable jurors because he had to use his peremptory challenges to remove these two jurors that should have been removed for cause.

¶ 10 We begin with the basic premise that the decision to excuse a prospective juror for cause rests within the sound discretion of the trial judge, whose decision will not be overturned unless an abuse of discretion is shown. *Myers v. State,* 2000 OK CR 25, ¶ 6, 17 P.3d 1021, 1026, *cert. denied,* 534 U.S. 900, 122 S.Ct. 228, 151 L.Ed.2d 163 (2001). This Court will review the prospective juror's entire voir dire examination to determine if the trial court made the proper discretionary decision. *Id.* A prospective juror must be willing to consider all the penalties provided by law, and the juror must not be irrevocably committed to any one punishment before trial has begun. *Myers,* 2000 OK CR 25, ¶ 6, 17 P.3d at 1026–1027.

¶ 11 Grant specifically claims that he lost two peremptory challenges because the trial court wrongfully denied his for-cause challenges to jurors Gee and Martin. Grant does not claim that jurors who were strongly biased toward the death penalty were allowed to sit on the jury. He claims that jurors Gee and Martin were unwilling to consider one or both of the two "non-death" punishment options. In Oklahoma, a defendant who disagrees with the trial court's refusal to remove a juror "for cause" must utilize a peremptory challenge in order to preserve his claim on appeal. *Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988).

¶ 12 Furthermore, a defendant must show that the jury sitting in the trial was biased, because he exhausted his peremptory challenges by being forced to remove those that should have been removed for cause. *Abshier v. State*, 2001 OK CR 13, ¶¶ 113–14, 28 P.3d 579, 603–04, *cert. denied*, 535 U.S. 991, 122 S.Ct. 1548, 152 L.Ed.2d 472 (2002); *also see Ross v. State*, 1986 OK CR 49, ¶ 11, 717 P.2d 117, 120, *aff'd sub nom Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988).

> "Trial judges enjoy 'broad discretion in deciding which members of the venire possess actual bias and should be excused for cause.' *Warner* [*v. State*,] 2001 OK CR 11, ¶ 6, 29 P.3d [569] at 572. However, in ruling on challenges for cause, all doubts regarding juror impartiality must be resolved in favor of the accused, who need not prove a juror's bias in favor of the death penalty with unmistakable clarity. *Warner*, 2001 OK CR 11, at ¶¶ 6 & 8, 29 P.3d at 572, 573. This means trial courts should consider the entirety of a prospective juror's *voir dire* to determine if their expressed feelings favoring the death penalty would prevent or substantially impair their performance as a juror. *Warner*, 2001 OK CR 11, ¶ 8, 29 P.3d at 573. On appeal, this Court will not grant relief based on the improper denial of a challenge for cause unless the record affirmatively shows that the erroneous ruling reduced the number of the appellant's peremptory challenges to his prejudice

and he must demonstrate that he was forced, over objection, to keep an unacceptable juror. *Warner*, 2001 OK CR 11, ¶ 10, 29 P.3d at 573–74."

*Matthews v. State*, 2002 OK CR 16, ¶ 16, 45 P.3d 907, 915.

¶ 13 Initially prospective juror Gee stated that if it were proven that the murder was "premeditated or planned" he would vote for the death penalty. After questioning by the prosecutor and the trial court, Gee insisted that he would follow the Court's instructions and consider all three sentencing options. Then defense counsel resumed questioning Gee by presenting the hypothetical that "the State has proven to you that he [Grant] intended to kill this woman, that he either thought about it for days or he just thought about it and did it, but he intended to kill this woman for no good reason ... without hearing another thing, would you automatically give him the death penalty?" Gee replied that he would have to think about that one. After given the opportunity to think, Gee replied, "Yes." Defense counsel then started to ask about instructions by the judge and Gee interrupted the questions and stated, "I would go by his instructions." Gee admitted that he was nervous and that he got confused. He stated that he would weigh the evidence and give it his best shot.

¶ 14 Prospective Juror Martin initially stated that he would consider all three sentencing options. When defense counsel asked Martin what the appropriate punishment would be for someone that committed intentional murder, Martin responded that he "wouldn't go less than life without parole." After the prosecution explained the procedure during a punishment stage, Martin gave assurances that he would consider all three punishment options. Even after further questioning by defense counsel, Martin stated that he changed his mind and that he would even consider a life sentence for an intentional murder. Clearly the trial court did not abuse its discretion in failing to remove Martin.

¶ 15 The harder issue is whether the trial court abused its discretion in failing to remove Gee. However, Grant has not shown that the arguably erroneous ruling reduced

the number of his peremptory challenges to his prejudice, and he has not shown that he was forced, over objection, to keep an unacceptable juror; therefore, we need not decide this issue.

¶ 16 In this case, after defense counsel exhausted his complement of peremptory challenges, counsel advised the trial court that if he had not been forced to use his peremptory challenges on Gee and Martin, he would have removed juror Hargrave. Defense counsel utilized his second peremptory challenge on prospective juror Gee and his ninth and final peremptory challenge on Martin.

¶ 17 During the individual in-camera voir dire of prospective juror Hargrave, Appellant moved to have her removed for cause; however, after questioning by the trial court and further questioning by defense counsel, Hargrave unequivocally stated that she would consider all three punishments. After the Hargrave voir dire, Appellant exercised his sixth peremptory challenge, but not for Hargrave. He claimed at trial, and now on appeal, that he was forced to keep Hargrave, who he called an "undesirable juror." However, Appellant's actions at trial contradict this claim. Appellant utilized two more peremptory challenges on jurors that he did not challenge for cause, without excusing Hargrave. Grant excused a total of three jurors whom he did not challenge for cause after Hargrave was seated; therefore, he cannot show that the jury was prejudiced against him, or that the trial courts ruling prejudiced him in any way. *See Abshier,* 2001 OK CR 13, ¶ 114, 28 P.3d at 604.

¶ 18 In fact, Grant does not claim that the jury was biased. The focus must be on the prospective jurors who ultimately sat on the jury. *Abshier,* 2001 OK CR 13, ¶ 113, 28 P.3d at 603. Failing in the burden to show that the jury was biased, Grant has not shown that this issue merits relief.

## B.

 ¶ 19 During the jury selection process, prospective jurors were asked to give their own personal definition of the legal concept "beyond a reasonable doubt." Grant complains, in proposition two, this constituted impermissible questioning. Not one time during trial did defense counsel object to the jurors being asked their personal definition

of this burden of proof. In fact, defense counsel told the jurors that all of their definitions were good, and he specifically expressed approval of the jurors who stated, "You have to be sure." As we said in *Simpson v. State,* 1994 OK CR 40, ¶ 2, 876 P.2d 690, 693, failure to object with specificity to errors alleged to have occurred at trial, thus giving the trial court an opportunity to cure the error during the course of trial, waives that error for appellate review...." We are left then to review for plain error only, i.e. errors "which go to the foundation of the case, or which take from a defendant a right which was essential to his defense." *Simpson,* 1994 OK CR 40, ¶ 12, 876 P.2d at 695.

¶ 20 In this case, there is no plain error. The main concern is whether the inquiry lowered the standard of proof necessary in a criminal case. *See Sullivan v. Louisiana,* 508 U.S. 275, 276–81, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (when a jury is instructed in a way that lowers the standard, the verdict cannot be considered a true verdict under the Sixth Amendment). In this case the questioning did nothing to lessen the burden of proof. The jury was instructed that the State's evidence must convince them "beyond a reasonable doubt." Neither the State nor the Trial Court attempted to define the term for the jurors. The questioning here was more analogous to attempts to distinguish between the "beyond a reasonable doubt" standard and a "beyond all doubt" standard, which we have stated is perfectly acceptable. *See Phillips v. State,* 1999 OK CR 38, ¶¶ 21–23, 989 P.2d 1017, 1028 (such comments are "merely attempts by the prosecution to dispel commonly held attitudes rather than attempts to define reasonable doubt."), *cert. denied* 531 U.S. 837, 121 S.Ct. 97, 148 L.Ed.2d 56 (2000). There is no error here.

## C.

 ¶ 21 In all criminal cases, potential jurors are routinely asked about their own personal experiences with criminal activity and the criminal justice system. Potential jurors, in this case, were asked how they had been impacted by crime and the criminal justice system. Grant complains, in proposition six, that one juror's response went too far and tainted the entire jury pool. This particular juror expressed anger over the fact that the person who murdered her father served only seventeen years of a forty-

five year sentence. Defense counsel requested a mistrial based on the statements arguing that the statements improperly introduced the possibility of parole and early release to the other prospective jurors. This potential juror was struck for cause by agreement of the parties.

¶ 22 The next day an *in camera* hearing was held on the issue. During the hearing defense counsel specifically objected to an admonishment by the court or to any questioning of the jurors regarding the impact of the statements on them. Counsel felt that this would only serve to reinforce the statements on the minds of the jurors.

¶ 23 In *Mayes v. State,* 1994 OK CR 44, ¶ 129, 887 P.2d 1288, 1316, *cert. denied* 513 U.S. 1194, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995), this Court stated that,

> The legislature's actions in making life without parole a viable sentencing option in first degree murder cases has obviously modified this Court's previous rulings insofar as they mandate a blanket prohibition against the jury's considering parole in deciding which sentence is appropriate. By its actions, the Legislature has created a specialized area of the law which mandates the jury must consider the possibility of parole in determining whether a defendant convicted of first-degree murder must live or die.

¶ 24 While jurors must consider the possibility of parole in a first-degree murder prosecution where "life without parole" is one of the sentencing options, a trial court must refrain from trying to define the parameters of parole with regard to a certain defendant. *Mayes,* 1994 OK CR 44, ¶ 134, 887 P.2d at 1317.

¶ 25 We are of the opinion that the statements of this potential juror did not taint the jury pool, and a mistrial was not required. This potential juror stated that the defendant in her Father's case pled guilty, and she did not know to which crime he pled guilty. When reviewing the voir dire on whole, we find that these comments did not create reversible error.

## D.

¶ 26 Correctional officers closely guarded Grant, who was in the custody of the Department of Corrections during trial. Grant complains, in proposition seven, that the method in which these officers were escorting him to and from the courtroom, violated the presumption of innocence. In this case, the prospective jury panel saw Grant being escorted from the courtroom, locked arm in arm with prison guards. At trial, Grant objected to this treatment, arguing that it was tantamount to placing him in handcuffs or shackles and made him look like an animal. He raises the same issue here.

¶ 27 Title 22 O.S.2001, § 15, provides, in part, "in no event shall [a person] ... be tried before a jury while in chains or shackles." This statute is designed to allow a defendant the "unrestrained use of his limbs," the freedom from "any physical bonds or burdens which might tend to confuse or embarrass his mental faculties," and to prevent prejudice against the defendant from interfering with the presumption of innocence. *French v. State,* 1962 OK CR 157, ¶¶ 9, 19, 377 P.2d 501, 503, *quoting* 14 Am. Jur., p. 855. "[A] prisoner or convict is entitled to the same fair and impartial trial, and is to be cloaked with full benefit of the presumption of innocence to which all men are entitled." *French,* 1962 OK CR 157, ¶ 19, 377 P.2d at 504.

¶ 28 However, this Court has clearly distinguished between the use of armed guards in a courtroom and being tried while in "chains and shackles." *Vavra v. State,* 1973 OK CR 229, ¶ 32, 509 P.2d 1379, 1384. Furthermore, the unintentional viewing of a defendant while being escorted in handcuffs outside the courtroom does not violate 22 O.S.2001, § 15. *Mehdipour v. State,* 1998 OK CR 23, ¶ 14, 956 P.2d 911, 917.

¶ 29 The prospective jurors, in this case, were fully aware that Grant was in prison on unrelated charges when this crime occurred. The trial court informed the jurors that the Department of Corrections officers were there because Grant was in prison when this "alleged" crime took place. After defense counsel objected to the treatment of Grant,

the trial court asked the guards to refrain from locking arms, and from that point on there were no more objections from defense counsel.

¶ 30 We find that the method of escorting Grant to and from the courtroom did not violate Section 15 of Title 22, nor did it undermine the presumption of innocence. The human restraint was not the equivalent of using chains, handcuffs or shackles. Grant was not restrained during trial, and the human restraint was limited to the time he was being escorted to and from the courtroom. There is no error here.

### III. FIRST STAGE ISSUES

#### A.

¶ 31 The State called two fellow inmates who testified against Grant. In proposition three, Grant argues that one of these inmates' identification of Grant as the one who threatened Carter on the day of the murder was not sufficiently reliable to be admissible.

¶ 32 Inmate Jerry James was working next to Carter, in the dining hall, serving breakfast on the morning of Carter's murder. He testified that on that morning another inmate who he did not know (but whom he identified at preliminary hearing and at trial as Grant) tried to take a tray other than his. Carter told him to "take the damn tray and go on." The inmate responded, "You're mine." James also testified that he saw Grant in the dining area after breakfast and that he saw Grant stabbing Carter.

¶ 33 Grant first complains that James's viewing of the inmate that was involved in the confrontation with Carter was too brief to support identification. Grant claims that the identification by James was especially damaging because it showed ill will between himself and Carter and negated the possibility that he did not know the consequences of his actions on the day of the murder. Grant disputes James's identification with the use of inmate Kuykendall who testified that he never saw Grant in the line that day even though he too was working next to Carter. Kuykendall testified that Grant threatened

Carter the day before, and not the day of the murder.

¶ 34 Grant alleges that the preliminary hearing identification was the first time that James identified him as the one who threatened Carter on the day of the murder. He claims that an OSBI agent who told James that John Grant was the one who attacked Carter tainted this identification, and the identification was unreliable because Grant was the only black man sitting at the defense table.

¶ 35 This Court has held, on more than one occasion, that an in court identification need not be excluded, even if there is impermissibly suggestive pretrial identifications, when there is independent indicia of reliability. *Young v. State,* 2000 OK CR 17, ¶ 31, 12 P.3d 20, 34, *cert. denied,* 532 U.S. 1055, 121 S.Ct. 2200, 149 L.Ed.2d 1030 (2001). This Court considers all of the surrounding circumstances of the identification as well as factors including (1) the prior opportunity of the witness to observe the defendant during the alleged criminal act; (2) the degree of attention of the witness; (3) the accuracy of the witness' prior identification; (4) the witness's level of certainty; and, (5) the time between the crime and the confrontation. *Id.*

¶ 36 In the present case, James had sufficient time to view Grant in the serving line to later identify him at trial. More importantly, he saw Grant loitering around the dining room and later saw him stabbing Carter. James said that there was no doubt in his mind that Grant was the one who told Carter, "You're mine," and the one who later attacked Carter. Even though six months had elapsed between the crime and the initial identification, this event was one that would have left quite an impression on James.

¶ 37 Furthermore, defense counsel thoroughly cross-examined James on his identification pointing out the facts that there was no photographic line-up, that he initially told investigators that the inmate who threatened Carter was a medium built black man, which described five other men in the room at the time, and that an OSBI agent had told him at preliminary hearing that John Grant was the one he saw.

¶ 38 The record as a whole fully supports the admissibility of James's identification of Grant as the one who threatened Carter the morning of her murder. The trial court did not abuse its discretion in allowing the identification testimony.

### B.

¶ 39 Grant complains about the introduction of a photograph, which he describes as irrelevant and highly prejudicial in proposition eight. The photograph, State's exhibit 13, depicts a portion of the victim's nude body. The photograph shows cleaned puncture wounds and bruising to Carter's torso. The State initially sought to introduce three such pictures during an in-camera hearing, but the trial court, after careful review, only allowed the State to introduce one of the photographs. Grant now complains that the photograph was cumulative to the medical examiner's report that contained a chart showing the location of the wounds.

¶ 40 In order to be admissible photographic evidence must be relevant, and photographs are admissible unless the probative value is substantially outweighed by the danger of unfair prejudice. 12 O.S.1991, §§ 2402–2403; *Myers*, 2000 OK CR 25, ¶ 33, 17 P.3d at 1031. The admission of photographs is a matter within the trial court's discretion, and this Court will not reverse the trial court's ruling absent an abuse of that discretion. *Myers*, 17 P.3d at 1032.

¶ 41 This photograph was relevant because it more closely depicted the nature and extent of some of the stab wounds on Carter's body than any other evidence available, including the medical examiner's depiction of the wound locations on a chart. The best evidence would have been to allow the jurors to see the crime as it was occurring. Second best would be to allow the jurors to view the victim's body just after she was stabbed. These two possibilities do not exist in this case. However, this evidence would have been more gruesome and prejudicial than the sterile, clinical photograph of Carter's body. *See Myers*, 2000 OK CR 25, ¶ 36, 17 P.3d at 1032. The trial court did not abuse its discretion in allowing the introduction of this photograph.

### C.

¶ 42 In proposition seven, Grant argues that his constitutional right to confront and cross-examine witnesses against him was violated when the trial court limited his cross-examination of Dr. Frederick Smith. Dr. Smith was called by the State as a rebuttal witness. Dr. Smith testified that he reviewed all of Grant's medical and mental health records maintained by the Department of Corrections, including a report by Dr. Elliot Mason. Dr. Smith concluded that he did not see any evidence of mental illness present with Grant.

¶ 43 On cross-examination, Grant attempted to question Dr. Smith about a portion of the report by Dr. Mason which contained Grant's statement to Dr. Mason that he thought the security people were contaminating his food. Defense counsel, before objection by the State, attempted to ask Dr. Smith if he just missed that part of the report. The trial court ruled that the questioning was beyond the scope of direct examination.

¶ 44 Part of Dr. Smith's testimony dealt directly with the issue of whether Grant exhibited any signs of having delusions. Smith testified that he had reviewed Dr. Mason's report before reaching his conclusions. The statement by Grant in Dr. Mason's report contradicted part of Dr. Smith's opinion that Grant exhibited no signs of having delusions. "The extent of cross-examination rests in the discretion of the trial court and reversal is only warranted where there is an abuse of discretion resulting in prejudice to the defendant." *Parker v. State*, 1996 OK CR 19, ¶ 13, 917 P.2d 980, 984, *cert. denied*, 519 U.S. 1096, 117 S.Ct. 777, 136 L.Ed.2d 721 (1997).

> "As a general rule, any matter is a proper subject of cross examination which is responsive to testimony given on direct examination or which is material or relevant thereto and which tends to elucidate, modify, explain, contradict or rebut testimony given in chief by the witness."

*Smith v. State*, 1985 OK CR 17, ¶ 14, 695 P.2d 864, 868.

¶ 45 Applying these general rules to the present case, we find that the attempted cross-examination was not beyond the scope of direct examination, and the trial court should have allowed the inquiry. However, prejudice must be shown. There was no prejudice to Grant resulting from the trial court's ruling in this case.

¶ 46 There had been no history of delusional behavior in the seventeen years that Grant had been in D.O.C. custody. The failure to allow cross-examination on this single, self-serving statement made three days after Grant murdered the kitchen worker and contained in a second-hand report had no impact on the jury's determination of guilt or the sentence in this case. Therefore, we find that the trial court's ruling was harmless beyond a reasonable doubt.

## IV. FIRST STAGE INSTRUCTIONS

¶ 47 Grant claims, in proposition four, that the trial court committed error by failing to instruct the jury on lesser-included offenses. Grant argues that the trial court should have instructed on the lesser offenses of second-degree murder and first-degree manslaughter. His argument is based on evidence of his mental illness that, he claims, precluded him from forming the specific element of malice aforethought necessary for a first-degree murder conviction. At trial, Grant only requested that the jury be instructed on the lesser offense of first-degree manslaughter.

¶ 48 It is the trial court's duty to instruct the jury on all lesser related offenses that are supported by the evidence, even absent a request from a defendant. *Shrum v. State*, 1999 OK CR 41, ¶ 6, 991 P.2d 1032, 1034. However, the trial court is only required to instruct on lesser offenses that are reasonably supported by the evidence. *Shrum*, 1999 OK CR 41, ¶ 11, 991 P.2d at 1036. "The test is an objective one—we do not ask a jury to consider a lesser offense if no jury could **rationally** find both that the lesser offense was committed and that the greater offense was not." *Frederick v. State*, 2001 OK CR 34, ¶ 137, 37 P.3d 908, 943–44 (emphasis in original).

¶ 49 A defendant cannot be convicted of second-degree murder if the evidence establishes that he acted with a premeditated intent to kill. 21 O.S.1991, § 701.8(1); *Williams v. State*, 2001 OK CR 9, ¶¶ 23–25, 22 P.3d 702, 712, *cert. denied*, 534 U.S. 1092, 122 S.Ct. 836, 151 L.Ed.2d 716 (2002). In this case, the evidence clearly establishes a premeditated design to kill. Grant procured a prison-made stabbing instrument, capable of causing fatal injuries. He then waited for Carter to come by the mop closet, where he grabbed her and forced her into the small room. He then stabbed her repeatedly in the area where her vital organs were located. The evidence simply does not support a finding that he acted without a premeditated design to effect death.

¶ 50 First-degree manslaughter requires that a person act with a "heat of passion" caused by "adequate provocation." 21 O.S. 2001, § 711. No evidence exists to support either of these elements. Therefore, the trial court did not err in failing to give this requested instruction.

¶ 51 Within this proposition, Grant urges this Court to recognize a "diminished capacity" defense to first degree murder wherein a defendant is incapable of forming the specific intent due to mental illness, yet something less than complete insanity. He compares this type of defense to the intoxication defense.

¶ 52 By accepting this defense, Grant argues that the diminished capacity would lessen the offense to Second Degree "depraved mind" Murder or First Degree Manslaughter. We need not reach the issue of a "diminished capacity" defense in this case, as Grant's evidence regarding his mental illness did not show that he suffered mental infirmities that would have rendered him incapable of forming the specific intent necessary. *Cf. Jackson v. State*, 1998 OK CR 39, ¶ 67, 964 P.2d 875, 892, *cert. denied*, 526 U.S. 1008, 119 S.Ct. 1150, 143 L.Ed.2d 217 (1999).

## V. SECOND STAGE ISSUES

¶ 53 Grant complains in proposition eleven that the use of his prior convictions to prove two aggravating circumstances, "prior

violent felony" and "murder committed by a person incarcerated on conviction of a felony," resulted in duplicitous aggravating circumstances which skewed the weighing process. We addressed this issue in *Green v. State*, 1985 OK CR 126, ¶ 26, 713 P.2d 1032, 1040–41, *cert. denied* 479 U.S. 871, 107 S.Ct. 241, 93 L.Ed.2d 165 (1986), *overruled on other grounds by Brewer v. State*, 1986 OK CR 55, ¶ 51, 718 P.2d 354, 365, n. 1. In *Green* we stated that the two aggravating circumstances complained of here cover different aspects of a defendant's criminal history. One aggravating circumstance focuses on a defendant's pattern of violent criminal history while the other focuses on his conduct while in prison. *Green*, 1985 OK CR 126, ¶ 26, 713 P.2d at 1042. We find that our reasoning in *Green* is sufficient for determination of this issue and we will not revisit our decision. There was no error in using evidence of Grant's robbery convictions to support both of these aggravating circumstances.

¶ 54 Grant claims, in proposition twelve, that the "continuing threat" aggravating circumstance is unconstitutionally vague and does not serve the proper narrowing process. We have repeatedly upheld the constitutionality of this aggravating circumstance and will not revisit this issue here. *Myers*, 2000 OK CR 25, ¶¶ 70–74, 17 P.3d at 1036–37.

## VI. VICTIM IMPACT EVIDENCE

¶ 55 Victim impact evidence, in this case, consisted of two statements written by Carter's daughter and brother respectively. Carter's sister read the first statement and Carter's friend read the second. In his ninth proposition, Grant complains about the method in which victim impact evidence was presented. Grant did not object to the reading of the first statement, but he did object to the second statement being read by a "nonfamily member" in violation of 22 O.S.1991, § 984.

■ ¶ 56 On Appeal, Grant argues that his Sixth Amendment right of confrontation and his Sixth Amendment right to effective counsel was violated by the introduction of the hearsay statements. He also argues that his Fourteenth Amendment Due Process

rights were violated because mitigation evidence and witnesses are given stricter treatment under the evidence code than are victim impact witnesses. Finally Grant argues that the introduction of victim impact evidence violates the Eighth Amendment right to a reliable sentencing proceeding. To the extent that there are different issues raised on appeal than those raised at trial, we will review for plain error only. Plain error is error that deprives a defendant of a constitutional or statutory right, and goes to the foundation of the case. *Stemple v. State*, 2000 OK CR 4, ¶ 37, 994 P.2d 61, 69, *cert. denied*, 531 U.S. 905, 121 S.Ct. 247, 148 L.Ed.2d 178 (2000).

¶ 57 The contents of the statements are not at issue here, except for a portion in which there is a recommendation of sentence, which we will discuss later. Suffice it to say that the content of these statements complies with the limitations on victim impact statements set forth in our case law and legislation.

■ ¶ 58 We have previously held that victim impact evidence, which meets the narrowly defined definition, is relevant in a first-degree murder prosecution. *Cargle v. State*, 1995 OK CR 77, ¶ 75, 909 P.2d 806, 828, *cert. denied*, 519 U.S. 831, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996). *Cargle* was decided after this State's legislature adopted "victim impact" statutes in response to the United States Supreme Court's decision in *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

> "[V]ictim impact evidence should be restricted to those unique characteristics which define the individual who has died, the contemporaneous and prospective circumstances surrounding that death, and how those circumstances have financially, emotionally, psychologically, and physically impacted on members of the victim's immediate family."

*Cargle*, 1995 OK CR 77, ¶ 75, 909 P.2d at 828. This Court has also held that the rules of evidence apply to victim impact testimony. *Hooks v. State*, 2001 OK CR 1, ¶ 37, 19 P.3d 294, 313, *cert. denied*, —— U.S. ——, 122 S.Ct. 371, 151 L.Ed.2d 282 (2001); *Conover v.*

*State,* 1997 OK CR 6, ¶ 72, 933 P.2d 904, 921. "Pursuant to 22 O.S.Supp.1993, § 984.1, a victim's family member may present an impact statement through testimony or through a written statement." *Hammon v. State,* 2000 OK CR 7, ¶ 32, 999 P.2d 1082, 1091, *cert denied,* 531 U.S. 1090, 121 S.Ct. 812, 148 L.Ed.2d 697 (2001). Clearly the legislature intended for written statements to be admitted in spite of the statutory rules of evidence. Whether this offends the confrontation clause is the issue here.

¶ 59 In *Ledbetter v. State,* 1997 OK CR 5, ¶¶ 37, 933 P.2d 880, 893, we recognized the fact that "a person designated by the victim or by family members of the victim" may present victim impact statements. However, we held that the legislature intended that the "person chosen to present the victim impact statement" should use his "own thoughts or observations to express the impact of a death on survivors of the victim." *Ledbetter,* 1997 OK CR 5, ¶ 38, 933 P.2d at 893. In *Ledbetter,* our holding allowed the chosen person to observe family members and to use those observations in the statement; however, that person may not receive aid in the composition of the statement from outside sources. *Ledbetter,* 1997 OK CR 5, ¶ 39, 933 P.2d at 893.

¶ 60 With these thoughts in mind, we struggle with the process of introducing a written victim impact statement to the jury. Usually when written statements are introduced, some method of sponsorship must be utilized. Either the person who prepared the document or someone who can identify and authenticate the document must testify. *See* 12 O.S.2001, § 2901. Alternatively, the parties may stipulate to the authenticity of the statements and allow the introduction without objection.

¶ 61 In this case, the statements were prepared by members of the victim's family and read in court by designees, because there was some indication that the family members would not be able to get through the statements without breaking down emotionally. There was no evidence that the readers had any independent knowledge of the facts in the statements. There is also no evidence about whether the family members that wrote the statement were in attendance at the sentencing.

¶ 62 We find that the reading of the statements by third parties did not comport with the provisions of either 21 O.S.2001, § 701.10 or 22 O.S.2001, §§ 984 & 984.1 or with our prior case law cited above. Grant could not, if he had chosen to do so, test the validity of the statements through meaningful cross-examination; therefore, his right of confrontation was hindered and error occurred.

¶ 63 Nevertheless, Grant chose not to challenge the content of the victim impact evidence presented in this case even after an in-camera hearing in which all parties reviewed the statements and knew that the statements would be read by third parties. Grant merely objected, during the in-camera hearing, that the second reader, Larry Young, was not a "member of the immediate family" as defined in 22 O.S.2001, § 984. The trial court chose to wait and rule on this issue at a more appropriate time, but Grant raised no objection to either reader, including Young, at the time the victim impact evidence was presented.

¶ 64 As a strategic choice, this may have been a rather wise move. If the respective authors of the statements had testified, the jury would have surely been witnesses to highly emotional outbursts. Grant's choice in allowing the statements to be read by these parties allowed the statements to be presented in a less prejudicial manner.

¶ 65 Many times this Court has found that improperly introduced victim impact evidence is harmless. Usually this is due to the fact that evidence of aggravating circumstances is overwhelming, evidence of the aggravating circumstances clearly outweighs the mitigation evidence, and the victim impact statements are "extremely short, far less emotional than the factual details of the death already in evidence, and of little or no weight in and of themselves." [4]

4. See *Abshier v. State,* 2001 OK CR 13, 28 P.3d 579, 606; *Welch v. State,* 2000 OK CR 8, 2 P.3d 356, 373; *Selsor v. State,* 2000 OK CR 9, 2 P.3d 344, 352; *Thornburg v. State,* 1999 OK CR 32, 985 P.2d 1234, *Darks v. State,* 1998 OK CR 15, 954 P.2d 152, 164.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

¶ 66 The same is true here, Grant, a prison inmate, serving sentences for violent felonies, violently stabbed a prison employee over some type of dispute about his breakfast tray. The three aggravating circumstances were clear and they obviously outweighed the mitigating evidence.

¶ 67 In fact, Grant does not object to the content of the victim impact statements, nor does he say how he would have cross-examined the witnesses who wrote the statements. He does not claim that the statements are untrue or that the writers are insincere. He has shown no prejudice or harm by the way the victim impact evidence was presented here. In fact, the method in which it was presented may have been the least harmful method available except for the mere presentation of the written statement to the jury. Therefore, any error in this method was harmless beyond a reasonable doubt.

¶ 68 Further, the jury was properly instructed on the use of victim impact evidence. The jury was instructed, pursuant to OUJI CR (2d) 9–45 (2000 Supp.), that victim evidence may only be considered after they "first find the existence of one or more aggravating circumstance has been proven beyond a reasonable doubt by evidence independent from the victim impact evidence and find that the aggravating circumstance(s) found outweigh the finding of one or more mitigating circumstances." This instruction properly channeled the jury's sentencing decision, and we find that the jury properly followed the instructions.

▮▮▮▮ ¶ 69 Grant's further assertion that he was denied due process because victim impact evidence is given less scrutiny than mitigation evidence is also unpersuasive. Victim impact evidence has historically been viewed with close scrutiny and we have always applied the rules of evidence to victim impact evidence. Namely, because victim impact evidence is intended to remind the sentencer that "the victim is an individual whose death may represent a unique loss to society and the family[,]" and that victim impact evidence may be considered in determining the appropriate punishment. OUJI CR (2d) 9–45 (2000 Supp.). Furthermore, Grant's argument does not deal with the specific facts of his case. Therefore, he cannot show that his due process rights were violated.

▮▮▮▮ ¶ 70 Lastly he claims that the introduction of victim impact evidence violates the Eighth Amendment right to a fair sentencing proceeding. We have held numerous times that properly presented victim impact evidence does not violate the Eighth Amendment. We further find that the method in which the evidence was presented here did not violate the Eighth Amendment.

▮▮▮▮ ¶ 71 As stated before, Grant does complain about the request for the sentence of death in each of the statements. We review these types of claims with a heightened degree of scrutiny. *Taylor v. State*, 2000 OK CR 6, ¶ 30, 998 P.2d 1225, 1233, *cert. denied*, 531 U.S. 1157, 121 S.Ct. 1109, 148 L.Ed.2d 978 (2001). In this case, each request was almost identical and consisted of a one-sentence request: "I believe that John Marion Grant should receive the death penalty."

¶ 72 This Court has previously held that a victim impact statement that contains a belief that the defendant should receive death penalty is admissible, but it must be a simple statement of the recommended sentence without amplification. *Conover*, 1997 OK CR 6, ¶ 70, 933 P.2d at 921; *Ledbetter*, 1997 OK CR 5, ¶ 31, 933 P.2d at 891. That is exactly what we have here. We find that this short statement did not undermine the reliability of the sentence imposed.

¶ 73 Grant has presented no argument regarding the victim impact evidence in this case that requires relief.

## VII. SECOND STAGE INSTRUCTIONS

¶ 74 Grant claims, in proposition fourteen, that the instructions on mitigation permitted the jurors to ignore mitigation and diminished the effect of the mitigating evidence presented in his case.

"We have consistently rejected the claim that instructing the jury they 'may consider' mitigating evidence creates a doubt as to the jury's constitutional duty to consider such evidence and recently reaffirmed

those holdings in *Welch v. State*, 2000 OK CR 8, ¶ 49, 2 P.3d 356, 374, *cert. denied*, 531 U.S. 1056, 121 S.Ct. 665, 148 L.Ed.2d 567 (2000)."

*Pickens v. State*, 2001 OK CR 3, ¶ 56, 19 P.3d 866, 883. We will not revisit this issue in this case.

## VIII. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

■■■ ¶ 75 No family members were called to provide mitigation evidence on Grant's behalf. In proposition thirteen, Grant claims that the failure to call certain family members in the second stage constituted ineffective assistance of counsel. An evidentiary hearing was held pursuant to Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2001), wherein the record in this case could be supplemented with the evidence regarding this issue. Pursuant to this rule, the trial court made written findings of fact and conclusions of law. We give strong deference to the findings of fact and conclusions of law of the trial court in determining the propositions; however, we shall determine the ultimate issue regarding effective assistance of counsel. Rule 3.11.

¶ 76 During the evidentiary hearing, trial counsel was asked why he did not call family members as mitigation witnesses. He testified that there were two main reasons. First, Grant told him that he basically had no contact with his family since he left home at the age of fifteen and was incarcerated since the age of nineteen. Grant indicated that he did not know where his family was located other than somewhere in Oregon. Grant told him that he didn't want his family involved in the proceedings. Regardless, Bowen did ask his investigators to try and contact Grant's family. One investigator testified that he was unable to locate Grant's family before trial. Appellant, John Grant, did not testify at this hearing.

¶ 77 Secondly, Bowen testified that because the family members had no close contact with Grant in some twenty years, their

testimony would be of little help. He felt like if they testified about their relationship, they would be vulnerable on cross-examination because they hadn't had any contact with him since he had been incarcerated.

¶ 78 The trial court found, and we concur, that the family members could have been contacted with the use of information located in Grant's prison records and they would have been willing to testify at trial. The trial court also found that the witnesses' testimony would have been cumulative to each other and would not have had a positive impact on the jury. We agree.

¶ 79 Ruth Grant, Appellant's mother, testified that she was a single mother who raised Appellant and six of his siblings in impoverished conditions. She testified that they moved to Oklahoma City when Appellant was five years old. She testified that he started getting into trouble when he was nine. She testified that he spent time in boys' homes and finally spent time in two juvenile prisons. She moved to Oregon in 1979 while Appellant was incarcerated. She testified that she visited Appellant for about one hour each year while he was in prison.

¶ 80 Several of Appellant's siblings testified. They all testified that Appellant was not violent toward them or toward anyone in the household. They testified that Appellant grew up with no father figure, except for an uncle, Clayton Black, who lived nearby. They also testified that they would have asked the jury to spare his life. Appellant's biological father testified that he had no contact with Appellant, but would have asked the jury to spare his life.

■■■ ¶ 81 In order to show that counsel was ineffective for failing to present this evidence at trial, Grant must show both deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).[5] In *Strickland*, the Court went on to say that there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional conduct, i.e., an appellant

---

5. The *Strickland* standard continues to be the correct test for examining claims of ineffective assistance of counsel where counsel fails to utilize mitigation evidence. *Bell v. Cone*, 535 U.S. 685, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

must overcome the presumption that, under the circumstances, counsel's conduct constituted sound trial strategy. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

¶ 82 To establish prejudice, Grant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

¶ 83 In the context of a capital sentencing proceeding, the relevant inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer … would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069.

¶ 84 We find that counsel's performance was not deficient. The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066; *Romano v. Gibson,* 239 F.3d 1156, 1181 (10th Cir.2001), *cert. denied,* 534 U.S. 1046, 122 S.Ct. 628, 151 L.Ed.2d 548 (2001).

> Although trial counsel has an independent duty to investigate and make a case in mitigation, counsel also has to be responsive to the wishes of his client, *see Wallace [v. Ward],* 191 F.3d [1235] at 1247–48 (holding counsel's performance during capital sentencing proceeding was not deficient, where counsel acquiesced in petitioner's wishes not to present any mitigating evidence or challenge State's evidence).

*Romano,* 239 F.3d at 1181. Grant's wish to exclude his family from the proceedings controlled trial counsel's actions in this case.

¶ 85 Trial counsel did present some mitigating evidence including Grant's own testimony and a prison psychiatrist. The prison psychiatrist testified that Grant had never been treated for any mental illness or syndromes.

¶ 86 Grant testified about his childhood, that he had eight brothers and sisters and that he left home, for the first time, at the age of twelve. He testified that he had been in and out of institutions since his teen years. He testified that when he reached the age of seventeen he was sentenced to adult prison and served one year. He testified that once he got out he committed the robberies for which he was incarcerated when this crime took place. He apologized to the family of the victim. The mitigating evidence Grant now claims his attorney was ineffective for not presenting would have repeated Grant's own account of his childhood.

¶ 87 Considering all of the evidence presented at trial and at the evidentiary hearing, we do not believe that trial counsel's conduct was "outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. The presentation of this evidence would have reinforced Grant's status as a repeat offender who has spent the majority of his life in prison. He has had no meaningful contact with the family members who would have testified. They knew nothing about his conduct in prison. Even though they testified that they would have asked the jury to spare his life, this would have been expected by the jury and would not have made a difference in the sentence given.

¶ 88 Grant has made no showing that the failure to find his family members and present their testimony at trial was the result of deficient performance, or that the failure rendered his sentence unreliable. *See Burger v. Kemp,* 483 U.S. 776, 795–96, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987). Even if he had shown deficient performance, Grant could not show that he was prejudiced by the failure to present this evidence.

¶ 89 Finally, Grant claims that counsel's failure to preserve certain errors constituted ineffective assistance of counsel. He first claims that the failure to object to jury questioning regarding their personal definitions of reasonable doubt constituted ineffective assistance. In our discussion of proposition two, we determined that the questioning was more analogous to attempts to distinguish between the "beyond a reasonable doubt" standard and a "beyond all doubt" standard, which we have stated is perfectly acceptable.

Therefore, counsel's failure to object did not amount to deficient performance.

¶ 90 Grant also claims that the failure of his counsel to make proper objections to the victim impact evidence constituted ineffective assistance. We dealt with counsel's performance with regard to the victim impact evidence in our discussion of proposition nine. Our conclusion was that trial counsel made reasonably strategic decisions; therefore, his performance was not deficient. Grant has not shown that trial counsel's conduct fell below reasonable standards of professionally competent assistance in any area.

## IX. CUMULATIVE ERROR

¶ 91 Grant urges us to consider his proposed errors in a cumulative fashion in proposition fifteen, if we find that none of them individually necessitate reversal of his conviction and sentence. We have reviewed the case to determine the effect, if any, of Grant's alleged accumulation of error. We find, even viewed in a cumulative fashion, the errors we identified do not require relief. *Woods v. State,* 1984 OK CR 24, ¶ 10, 674 P.2d 1150, 1154.

## X. MANDATORY SENTENCE REVIEW.

¶ 92 Title 21 O.S.1991, § 701.13, requires this Court to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance." Sufficient evidence existed to support the finding of the three statutory aggravating circumstances. Grant was in prison serving a sentence for conviction of a felony; he had been convicted of felonies involving violence; and based on his prior violent past and the violence of this crime, the jury could reasonably conclude that there was the existence of a probability that the Grant would commit criminal acts of violence that would constitute a continuing threat to society.

¶ 93 After reviewing the entire record in this case, we find that the sentence of death was not imposed because of any arbitrary factor, passion, or prejudice. The facts of this case and the overwhelming evidence of the aggravating circumstances simply warranted the penalty of death.

¶ 94 We find no error warranting reversal of Grant's conviction or sentence of death for first-degree murder, therefore, the Judgment and Sentence of the trial court is, hereby, **AFFIRMED.**

LUMPKIN, P.J., JOHNSON, V.P.J., and STRUBHAR, J., concur.

CHAPEL, J., dissents.

CHAPEL, Judge, Dissenting:

¶ 1 On November 13, 1998, John Marion Grant killed Gay Carter by laying in wait for her, grabbing her, dragging her into a tiny room at the Connor Correctional Center, and repeatedly and brutally stabbing her to death. Grant had previously worked for Carter, who was a civilian cafeteria supervisor. According to Grant she had always been kind to him, and he considered her his "friend." Grant's only prior dispute with Carter was a disagreement relating to his breakfast tray on the day before the murder and again on the day of the murder. On both occasions, however, he threatened Carter; and after breakfast was over on the second day, he killed her.

¶ 2 The vicious and unprovoked attack was observed by eyewitnesses, and Grant was apprehended afterward still holding the murder weapon. Thus there was never any doubt that it was Grant who killed Carter. In addition, because Grant had no significant history of mental illness, nor did any doctor ever determine that he was insane, an insanity defense had no realistic chance for success at trial. Furthermore, because Grant committed the murder while serving a 130–year prison sentence for four armed robbery convictions, two of the three aggravating circumstances alleged in his capital trial were essentially incontrovertible (*i.e.,* prior violent felony conviction(s) and that the murder was committed while serving a felony prison sentence), and the third was practically a given as well (*i.e.,* that he posed a continuing threat of future violence).

¶3 Consequently, the essential task of Grant's assigned counsel at trial, though difficult to be sure, should have been patently clear: give the jury a reason to spare his life. Counsel was certainly obligated to hold the State to its burden of proof throughout and to defend the case to the best of his ability. Yet the circumstances of the crime and Grant's history compel the conclusion that *effective* assistance could only be provided in this case by attempting to give the jury (or at least a single juror) some reason to spare Grant's life.[1]

¶4 The goal of persuading jurors to spare the life of a person that they have already convicted of first degree murder can be pursued at trial through any number of different approaches, such as attempting to "humanize" the defendant, suggesting that he deserves some sympathy or mercy because of the circumstances of his life history, present-ing friends or family to plead for his life, *etc.*, either alone or in combination. Yet almost all of these approaches have one thing in common; they rely on the presentation of mitigating evidence relating to the individual defendant. Hence the centrality of mitigating evidence within a capital trial has been repeatedly recognized by the United States Supreme Court, this Court, and courts throughout the country.[2]

¶5 Such mitigating evidence can only be presented if it is first discovered. Hence the Supreme Court, this Court, and other courts have likewise insisted that effective assistance of counsel at trial requires that defense counsel diligently seek to obtain and develop mitigating evidence regarding the defendant.[3] And this obligation includes investigating and pursuing mitigating evidence relating to the defendant's background and family history.[4] Defense counsel who have

1. In Oklahoma a jury can only sentence a defendant to death if it first finds that at least one statutory aggravating circumstance exists in the case and that the aggravating circumstance(s) outweigh the mitigating circumstances in the case. *See* 21 O.S.1991, § 701.11. Yet even when a jury has made both of these findings, it nonetheless remains free to sentence a defendant to life or life without parole. *See Carpenter v. State*, 1996 OK CR 56, 929 P.2d 988, 1000; *Walker v. State*, 1986 OK CR 116, 723 P.2d 273, 284, *cert. denied*, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1986). Thus capital jurors always retain the right to spare the life of the defendant, regardless of the specific circumstances of the case. If even one juror refuses to sentence a defendant to death, the trial court must impose a sentence of either life or life without parole. *See* 21 O.S. 1991, § 701.11 ("If the jury cannot, within a reasonable time, agree as to punishment, the judge shall dismiss the jury and impose a sentence of imprisonment for life without parole or imprisonment for life.").

2. Mitigating evidence plays a central role in a capital jury's sentencing determination, both in the mandatory "weighing" of aggravating and mitigating circumstances and in the ultimate selection of penalty for defendants who are "death eligible," a selection process that is not bound by any particular guidelines or standards. *See, e.g., Williams v. Taylor*, 529 U.S. 362, 398, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); ("Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case."); *Warner v. State*, 2001 OK CR 11, 29 P.3d 569, 575 ("It is beyond dispute that mitigating evidence is critical to the sentencer in

a capital case."); *Wallace v. State*, 1995 OK CR 19, 893 P.2d 504, 510 ("It is beyond question mitigating evidence is critical to the sentencer in a capital case.") (citations omitted), *cert. denied*, 516 U.S. 888, 116 S.Ct. 232, 133 L.Ed.2d 160 (1995).

3. *See, e.g., Williams*, 529 U.S. at 393, 120 S.Ct. 1495 (reversing capital sentence where "it is undisputed that Williams had a right—indeed, a constitutionally protected right—to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer"); *Abshier v. State*, 2001 OK CR 13, 28 P.3d 579, 600–01 (recognizing defense counsel's duty to investigate mitigating evidence in capital case), *cert. denied*, —— U.S. ——, 122 S.Ct. 1548, 152 L.Ed.2d 472 (2002); *Brecheen v. Reynolds*, 41 F.3d 1343, 1366 (10th Cir.1994) (emphasizing that capital defense attorney "has a *duty* to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence") (emphasis in opinion), *cert. denied*, 515 U.S. 1135, 115 S.Ct. 2564, 132 L.Ed.2d 817 (1995); *Battenfield v. Gibson*, 236 F.3d 1215, 1226–34 (10th Cir.2001) (emphasizing critical importance of capital counsel's duty to seek out and develop mitigating evidence, even where defendant states that he does not want to present any mitigating evidence at trial).

4. *See, e.g., Williams*, 529 U.S. at 396, 120 S.Ct. 1495 (noting capital defense counsel's "obligation to conduct a thorough investigation of the defendant's background"); *Warner*, 29 P.3d at 575 (finding ineffective assistance of counsel where attorney failed to take necessary steps to ensure that defendant's mother was allowed to testify during second stage of capital trial); *Bre-*

diligently sought to obtain and develop such evidence enjoy broad discretion in deciding how to present it at trial and even whether to present it at all. Capital counsel have no discretion, however, to simply neglect to seek out such evidence.

¶ 6 Although a naked plea for mercy could possibly constitute effective assistance in a particular case (such as where a diligent investigation did not reveal viable mitigating evidence), such an approach can only be chosen after counsel first seeks to obtain mitigating evidence relating to the individual defendant. It is a cardinal rule of capital defense (and logic) that counsel cannot be exercising his or her "discretion" in neglecting to present particular mitigating evidence if counsel does not know that such evidence exists. Similarly, counsel cannot "reasonably" decide not to present a particular type of mitigating evidence—such as evidence involving a defendant's childhood and family history—if counsel does not first discover and develop such evidence to some degree, such that its potential impact can be understood and realistically evaluated.[5]

¶ 7 Although an attorney is entitled to make reasonable strategic decisions about which leads to investigate and how far to pursue particular investigations, strategic decisions made after incomplete investigations will be evaluated according to the reasonableness of the attorney's decision to limit his or her investigation, under all the circumstances of the case.[6] In a capital case, decisions about what approach to pursue and what evidence to present in the second stage, when made without adequate investigation of potential mitigating evidence, cannot be justified by merely invoking the mantra of "strategy."[7]

¶ 8 In his thirteenth proposition of error, Grant claims that his trial counsel was ineffective for failing to adequately investigate and present mitigating evidence from members of his family.[8] Grant sought an evidentiary hearing on the issue, and on January 4, 2002, this Court remanded this case to the district court for an evidentiary hearing limited solely to this issue.[9] The evidentiary

cheen, 41 F.3d at 1366 (duty to investigate possible mitigating evidence in capital case includes duty to investigate defendant's background); Battenfield, 236 F.3d at 1226–35 (granting second-stage habeas relief where counsel failed to interview defendant's parents and other relatives and friends about possible mitigating evidence in defendant's background).

5. See Stouffer v. Reynolds, 168 F.3d 1155, 1166–67 (10th Cir.1999) (rejecting argument that counsel's failure to present mitigating character evidence was "tactical decision," where counsel failed to investigate possible mitigating evidence and asserted strategy was illogical).

6. See Strickland v. Washington, 466 U.S. 668, 690–91, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); Kimmelman v. Morrison, 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (quoting Strickland); see also Brown v. State, 1994 OK CR 12, 871 P.2d 56, 76, cert. denied, 513 U.S. 1003, 115 S.Ct. 517, 130 L.Ed.2d 423 (1994).

7. See Brecheen, 41 F.3d at 1369 ("[I]t is important to note that 'the mere incantation of "strategy" does not insulate attorney behavior from review, an attorney must have chosen not to present mitigating evidence after having investigated the defendant's background, and that choice must have been reasonable under the circumstances.' ") (emphasis in opinion) (citations omitted); Battenfield, 236 F.3d at 1229 (finding that counsel's failure to investigate defendant's background left him "unaware at the time of trial of various mitigation strategies and accompanying pieces of evidence that could have been presented during the mitigation phase by [defendant] or his friends and family").

8. Claims of ineffective assistance for failure to adequately investigate and present mitigating evidence are treated in essentially the same manner as most other ineffective assistance claims, requiring both deficient attorney performance and prejudice to the defendant. See Strickland, 466 U.S. at 686–87, 104 S.Ct. 2052; Williams, 529 U.S. at 390–91, 120 S.Ct. 1495.

9. In order to grant this evidentiary hearing, this Court was required to find and did find that Grant had shown "by clear and convincing evidence that there is a strong possibility his trial counsel was ineffective for failing to develop and present mitigating evidence from members of [his] family." See Rule 3.11(B)(3)(b)(i), Rules of the Oklahoma Court of Criminal Appeals, Title 22,

hearing was held on February 22, 2002, and the district court filed its findings of fact and conclusions of law regarding the remanded issue on April 3, 2002.

¶ 9 Although this Court gives strong deference to district court findings that are supported by the record, the majority opinion correctly recognizes that this Court retains the ultimate authority to determine whether trial counsel's performance constituted ineffective assistance of counsel.[10] Furthermore, trial court findings that are not supported by the record are not entitled to "strong deference."[11]

¶ 10 All nine of the family members whose affidavits were attached to Grant's application for an evidentiary hearing testified at the evidentiary hearing. These family members are related to Grant as follows: Ruth L. Grant (mother), Walter Grant (father), Clayton Black (maternal uncle), Ronnie Grant (older brother), LaRonda Hovis (oldest sister), Ruth Ann Grant Burley (older sister), Andrea Grant (younger half-sister), Gregory Grant (younger half-brother), and O.C. Frazier (youngest half-brother). Of these nine family members, six traveled from their homes in Portland, Oregon to attend the hearing.[12] All nine family members testified that they were never contacted by defense counsel regarding Grant's trial, but that they would have testified if they had been asked to do so.

¶ 11 Ruth, LaRonda, Ruth Ann, Andrea, Gregory, and O.C. testified that they were living in Portland during the time from the November 1998 killing of Gay Carter through Grant's February/March 2000 trial. Ronnie testified that he was living in Los Angeles during that time. Yet the district court specifically found that all nine family members "were findable and would have testified at trial if they had been asked." This factual finding is amply supported by evidence presented at the evidentiary hearing, and today's Court majority states that "we concur that the family members could have been contacted with the use of information located in Grant's prison records and [that] they would have been willing to testify at trial." The district court also found that "trial counsel did little to develop the mitigating evidence" that these persons could have offered. This finding is likewise amply supported by the record and is not disputed by today's majority.[13]

¶ 12 Nevertheless, the district court also concluded that "[n]ot calling family members to testify at trial was trial strategy and not an oversight on trial counsel's part." The district court did not make a specific finding

---

Ch. 18 App. (1998). Our evidentiary hearing remand ordered the district court to make findings about (1) the availability of the evidence and witnesses presented at the evidentiary hearing, (2) the probable effect of these witnesses and evidence if they/it had been presented at trial, (3) whether the failure to develop and present these witnesses and this evidence was a matter of trial strategy, and (4) whether the evidence and witnesses would have been cumulative or would have affected the jury's sentencing determination. *See* Rule 3.11(B)(3)(b)(iii). We also directed the district court to determine whether Grant waived his right to present mitigating evidence from his family, and if so, whether the waiver was knowing and intelligent.

10. *See* Rule 3.11(B)(3)(b)(iv).

11. *See Glossip v. State,* 2001 OK CR 21, 29 P.3d 597, 602 ("This Court will give the trial court's findings strong deference *if supported by the record,* but we shall determine the ultimate issue of whether trial counsel was ineffective.") (emphasis added) (citing Rule 3.11(B)(3)(b)(iv)); *see also Wood v. State,* 1998 OK CR 19, 959 P.2d 1, 17; *Humphreys v. State,* 1997 OK CR 59, 947 P.2d

565, 577, *cert. denied,* 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998).

12. Ruth, LaRonda, Andrea, Ronnie, Gregory, and O.C. testified that they currently live in Portland, Oregon or a suburb thereof.

13. Grant's trial counsel testified at the evidentiary hearing that two different investigators (Steve Leedy and John Remington) worked on Grant's case and that he directed these investigators to try to locate members of Grant's family. He testified that Grant did give him names of some of his relatives and that he thought he gave these names to the investigators too. Trial counsel vacillated between saying that he did not know whether either of the investigators ever found any family members and saying that he knew that they were not able to do so. Counsel acknowledged that Grant brought him an envelope during the trial with his mother's name and a local return address on it, and that he gave the letter to Investigator Remington to attempt to contact her, but stated that he did not know what happened in that regard. Trial counsel acknowledged that he never asked for a continuance to find any of Grant's relatives.

about whether trial counsel's performance in this regard constituted "reasonably effective assistance," but the court's finding that counsel made a strategic decision not to present the testimony of anyone from Grant's family (without ever actually contacting or speaking with any such person), as well as the overall tone of the court's findings, suggests that the district court concluded that counsel's performance was adequate in this regard. In addition, today's majority makes its own determination that trial counsel's performance was adequate in this regard, seemingly based upon its own factual determination that Grant waived the presentation of evidence from his family.[14]

¶ 13 Yet the district court found that Grant did *not* waive the presentation of mitigating evidence from members of his family.[15] This finding is well supported by the record.[16] The majority does not find that the trial court's "no waiver" finding is erroneous or that it is not supported by the record. Hence the majority cannot rely on its own waiver finding to justify its conclusion that

**14.** The majority opinion's analysis is as follows: "We find that counsel's performance was not deficient. The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions...." This statement is followed by citations to cases that recognize the principle that defense counsel's actions must be evaluated in the context of the defendant's actions and that strategic decisions about the presentation of mitigating evidence can be made in consultation with the defendant.

**15.** The district court found that "it must be concluded that defendant did not specifically waive the presentation of this testimony."

**16.** Although this Court has recognized a defendant's right to waive the presentation of mitigating evidence during the second stage of his capital trial, we have insisted that any such waiver is valid only if the defendant is adequately advised of and understands the nature of mitigating evidence and its role in the capital sentencing process. *See Wallace*, 893 P.2d at 510–12. Consequently, we have established guidelines and a procedure to be utilized whenever a defendant desires to waive the presentation of mitigating evidence in his case. *See id.* at 512–13. This procedure was not followed in Grant's case, and the record contains no evidence of any statements to the trial court regarding Grant's desire to waive the presentation of mitigating evidence from his family.

counsel's failure to seek out and develop mitigating evidence from Grant's family was reasonable.

¶ 14 In general, both the district court and today's majority opinion appear to confuse and conflate two distinct issues: (1) defense counsel's obligation to investigate and develop mitigating evidence regarding a capital defendant's background and family history, and (2) the subsequent strategic decision about what mitigating evidence to present to the jury. Grant's counsel did not make a strategic decision to not present the mitigating background and family history evidence that came out at the evidentiary hearing. Grant's counsel totally failed to discover this evidence, because he failed to contact anyone from Grant's family. Hence the district court's finding that defense counsel's failure to present the family testimony "was trial strategy and not an oversight on trial counsel's part" does not make sense and is not supported by the evidence.

The only evidence in the record that Grant "waived" the opportunity to present testimony from his family is the evidentiary hearing testimony of his trial counsel that Grant "indicated to me that he really didn't want his family to be involved" and that family testimony "was not something that [Grant] was interested in pursuing." On the other hand, the following evidence in the record strongly suggests that Grant did not waive the presentation of family testimony: (1) the fact that trial counsel and his investigators acknowledged having conversations with Grant about his family members and where they could be found; (2) the fact that counsel and the investigators do not suggest that Grant refused to provide family information, but rather that he provided what information he possessed; (3) the fact that counsel testified that he was familiar with the requirements for a waiver hearing in the event that a defendant desired to waive the presentation of mitigating evidence, but that he never considered seeking such a hearing in Grant's case; and (4) the fact that during the trial Grant provided counsel with a letter from his mother bearing a local return address.

In addition, the record in this case could not possibly support a finding that any waiver by Grant was "knowing and intelligent," since trial counsel acknowledged that he had no specific recollection of discussing with Grant (1) what the second stage of a capital trial was about, (2) the potential role and importance of family testimony in a capital trial, or (3) the fact that family members could be important sources of information in a capital trial, even if they did not testify.

¶ 15 If trial counsel had made reasonable efforts to locate and interview members of Grant's family and then decided not to present that testimony (*i.e.*, after first determining what that testimony was likely to be), a decision not to present the testimony could possibly have been a reasonable trial strategy.[17] Yet under the circumstances of this case, trial counsel could not have reasonably decided that testimony from members of Grant's family would not be helpful, unless he had first located and interviewed at least some of them.[18] Consequently, I conclude that defense counsel did not provide adequate assistance of counsel in regard to investigating and presenting mitigating evidence and that Grant has satisfied the "performance" prong of the test for second-stage ineffective assistance.

¶ 16 The closer question, in my opinion, is the issue of prejudice.[19] In order to obtain relief Grant must show that there is a "reasonable probability" that if trial counsel had presented the omitted mitigating evidence at trial, the jury "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."[20] In making this prejudice determination, the newly proffered mitigating evidence must be considered along with the mitigating evidence that was presented and then weighed against the aggravating evidence that was presented.[21]

¶ 17 Although the district court emphasized that it hesitated to predict what a jury would do in any particular case, it concluded that Grant had not established prejudice from the failure to present the family testimony in his case. Specifically, the district court found (1) that the family testimony was "cumulative," (2) that it "would have had no positive effect on the jury," and (3) that it "would have had no effect on the jury's sentencing determination as the evidence of the three aggravating circumstances was overwhelming." After thoroughly reviewing the evidence presented by members of Grant's family at the evidentiary hearing (summarized below), I conclude that the district court's findings in this regard are not supported by the record.[22]

17. Trial counsel testified that he chose not to call any of Grant's family members to testify because Grant had been incarcerated continuously since he was 19 years old and had little contact with his family during this time period. Counsel concluded that any claims of enduring love by Grant's family members could appear insincere and would be vulnerable on cross-examination. Yet counsel does not appear to have considered or fully appreciated the fact that testimony from family members other than statements of affection for the defendant can be relevant and even critical to the second stage of a capital trial. In particular, counsel does not appear to have considered the potential value that testimony from members of Grant's family could have had in helping the jury understand Grant's background and the difficult circumstances in which he grew up. Furthermore, counsel does not appear to have considered the fact that a lack of continuing family support could potentially be a mitigating circumstance in itself, or the fact that most of Grant's family lived far from the place where he was incarcerated, which would have helped explain why family members did not visit more often. *See Williams*, 529 U.S. at 396, 120 S.Ct. 1495 (finding that counsel's failure to present mitigating evidence regarding defendant's childhood and family history, borderline retardation, and good behavior in prison was "not justified by a tactical decision to focus on [defendant's] voluntary confession").

18. *See Mayes v. Gibson*, 210 F.3d 1284, 1289–90 (10th Cir.2000) (failure to present mitigating evidence from members of defendant's family could not be justified as reasonable strategic decision where counsel never contacted potential witnesses: "Without inquiring into what the witnesses might say, counsel had no basis for deciding their testimony would be inconsistent with his defense theory."), *cert. denied*, 531 U.S. 1020, 121 S.Ct. 586, 148 L.Ed.2d 501 (2000).

19. Surprisingly, today's majority opinion focuses all of its analysis on the performance prong of Grant's ineffective assistance claim, addressing the prejudice claim with only the concluding (and conclusory) statement that "[e]ven if he had shown deficient performance, Grant could not show that he was prejudiced by the failure to present this evidence."

20. *See Strickland*, 466 U.S. at 695, 104 S.Ct. 2052; *Brown v. State*, 1997 OK CR 1, 933 P.2d 316, 322.

21. *See Williams*, 529 U.S. at 397–98, 120 S.Ct. 1495.

22. It should be noted that although the district court described the family testimony as "rehearsed," the court did not question the believability of the numerous statements of fact contained within this testimony, particularly those about Grant's childhood and family history. It

¶ 18 The family members painted a rather depressing picture of the circumstances into which Grant was born and in which he grew up. John Marion Grant was the sixth of nine children and the last fathered by his mother's former husband, Walter Grant.[23] Walter left the family home in Ada, Oklahoma approximately one month before John was born, leaving Ruth with six children to raise on her own. Walter moved to Los Angeles and never provided any financial support to Ruth or the children. Although the two oldest brothers eventually went to live with Walter in Los Angeles, Grant was left in Oklahoma and had very little contact with his father while he was growing up.

¶ 19 During the three years following Walter's departure and Grant's birth, Ruth had three more children (Andrea, Gregory, and O.C.), the last of which was named after their father, O.C. Frazier. O.C. Frazier never lived in Ruth's home with the children, and John never experienced having a male role model in the family home. Instead, the two oldest sisters in the family were expected to play very substantial roles in running the home and raising and disciplining the younger children, including Grant, even while they were still children themselves.

¶ 20 Ruth's only sources of income to support her large family were Aid to Dependent Children and some part-time work cleaning people's homes. LaRonda described their family as "dirt poor, extremely poor." The first family home in Ada had only three rooms and no indoor plumbing, and the family did not own a car. When Grant was approximately five years old, the family moved to Oklahoma City, where they lived next door to Ruth's brother, Clayton Black. Black lived across the street from some apartment buildings that were known as "the projects," and Ruth and the children eventually moved into these apartments. Family members testified that things got even worse in the new neighborhood, which was poor, tough, crime-ridden, run down, and dangerous, particularly in the projects. In 1979, Ruth and the children who were still in the home moved to Portland, Oregon to escape the neighborhood. Grant was unable to go with the family, however, because he was confined to a juvenile facility at the time.

¶ 21 The family members described Grant as being "sweet," "loving," "quiet," "sensitive," and "gentle" when he was a child. He loved animals and pets, especially dogs. Some of Grant's sisters testified that he did not get much attention from their mother and that he needed more love than he got. Many of the family members remembered Grant crying a lot as a child. Ruth noted that Grant first started having problems and getting into trouble when the city started busing the children to schools outside the neighborhood. Some of Grant's siblings testified that when Grant first started stealing as an adolescent, he was stealing things like clothing and shoes for the younger children in the family.

¶ 22 Grant's younger siblings testified that he was very protective of them and that he would come to the aid of his younger brothers when older boys in the neighborhood threatened them or tried to fight them. Gregory testified that Grant gave him "quite a bit of advice growing up" and that Grant attempted to steer him away from some of the "badder guys" in the neighborhood. He stated that even though Grant did not follow his own good advice, "he pretty much wanted to make sure that the people who were younger or his beloved brothers didn't get into the type of lifestyle he got into." Andrea testified that Grant was her "favorite brother" and that they were very close as children. O.C. likewise described Grant as a "cool brother" who was always there for him and who helped him out a lot.

¶ 23 LaRonda testified that Grant once helped her escape from an abusive boyfriend

should likewise be noted that within the State's "Proposed Findings of Fact and Conclusions of Law," which was filed with the district court after the evidentiary hearing, the State proposed that the court find as "facts" numerous specific statements made by members of Grant's family about his background, childhood, and character. The State's proposed findings nowhere suggest that the family testimony regarding Grant's childhood and background was not credible.

23. The children born to Ruth and Walter Grant, in the order of their birth, were Kenneth, Ronnie, LaRonda, Ruth Ann, Norman, and John.

and that she was very touched by the concern he showed for her and her children at that time. Gregory testified that Grant always loved small children, particularly his nieces and nephews. And all of the family members testified that Grant was never violent or verbally abusive within the family, even as an adolescent.

¶ 24 The family members also testified that they stilled loved Grant and that they would like the opportunity to maintain or renew their relationships with him. Some expressed regret about their failure to provide Grant with more support. All of the family members testified that if they had been given the opportunity to testify at Grant's trial, they would have asked the jury to spare his life.

¶ 25 The exact meaning of the district court's finding that the family testimony was "cumulative" is unclear. To the extent that the district court was finding that this testimony was cumulative in relation to the evidence put on during the second stage of Grant's trial, this finding is clearly contradicted by the record in this case. The only testimony relating to Grant's childhood and family life that was put on during the second stage of his trial was his own testimony that he had five brothers and three sisters, among which he was "somewhere in between." Grant also acknowledged that he was in a number of juvenile institutions during his teen years and that he left home at the age of seventeen. Grant's minimal description of the number of children in his family and some of his placements as a teenager certainly does not make the vast array of mitigating evidence presented by members of his family merely "cumulative." [24] Furthermore, to the extent that the district court was finding that the family testimony was cumulative in relation to itself (because many of the family members testified in the same way), such a finding could not justify trial counsel's failure to present testimony from any of the family members, but would suggest only that he did not need testimony from all of them.

¶ 26 I likewise conclude that the district court's findings that the family testimony would have had "no positive effect on the jury" and also "no effect" on its ultimate sentencing determination were erroneous and unreasonable. As the district court itself conceded, predicting what would and would not have mattered to a jury is necessarily a dubious and highly imprecise exercise. The district court refuses to countenance even the possibility that the extensive information provided by Grant's family about his difficult and deprived childhood, his personality and behavior within the family, some of the circumstances surrounding his initial delinquent behavior, some of his positive qualities, *etc.* (along with the pleas for mercy on their son, brother, and nephew), could have touched the hearts of one or more jurors to spare Grant's life. To me, this seems to deny the possibility for human compassion and mercy, even in the context of the "overwhelming" aggravating circumstances in the current case. I find the omitted mitigating evidence to be substantial and powerful, and I believe that one or more jurors could have been affected by it as well.

¶ 27 Even if this Court could feel somewhat confident in making a judgment (as we are here obligated to do) about whether a jury would care about Grant's background and deprived childhood, I do not understand why we would choose to err on the side of sending a man more quickly to his death, based upon speculation about what a hypothetical jury would do, rather than allow an actual jury to make that determination, equipped with all of the information that should rightfully be put before it. I conclude that Grant has established that there is a reasonable probability that at least one juror at his trial would have been affected by the omitted family evidence, so as not to vote for the death penalty in his case. Hence I find that the failure of defense counsel to investigate and present mitigating evidence from members of Grant's family constituted constitutionally ineffective assistance of counsel and that Grant was prejudiced by this fail-

---

**24.** Today's majority opinion states that "[t]he testimony Grant now claims his attorney was ineffective for not presenting would have repeated Grant's own account of his childhood." Because counting one's siblings cannot be reasonably construed as providing an account of one's "childhood," I find this statement to be ridiculous and patently false.

ure. This case should be remanded for a resentencing proceeding on this basis, and I dissent from the majority's refusal to do so.

¶ 28 The critical importance of the jury's decision about whether to spare the life of a capital defendant or sentence him to death is also at the heart of another issue upon which I dissent from today's majority opinion. In his first proposition of error, Grant challenges the trial court's denial of his for-cause challenges of prospective jurors Gee and Martin, based upon their unwillingness to consider one or both of the "non-death" sentencing options under Oklahoma law (*i.e.*, life and life without parole). Grant maintains that the court's failure to excuse these jurors for cause necessitated their removal through peremptory challenges, thereby prejudicially denying him the use of two of his nine statutory peremptory challenges.[25]

¶ 29 It is important to understand that Grant does not complain that a juror who was strongly biased toward the death penalty was allowed to serve in his case. Rather, he complains that his for-cause challenges of Gee and Martin were wrongfully denied, thereby forcing him to use two of his peremptory challenges to remove these persons from the jury.[26] Because the loss of a per-

emptory challenge due to the need to "correct" a trial court's improper denial of a for-cause challenge is not itself a constitutional violation,[27] Grant is only entitled to relief if he can show that his for-cause challenge of either Gee or Martin was wrongly denied *and* that the necessity of using a peremptory challenge to strike that juror prevented him from removing another "unacceptable" or "undesirable" juror from his panel.[28]

¶ 30 Grant properly preserved this claim at trial by asserting that the denials of his for-cause challenges of Gee and Martin were improper, using all nine of his peremptory challenges, requesting additional peremptory challenges, and specifically naming a juror (juror Hargrave) that he considered undesirable but whom he was unable to remove due to the necessity of using peremptory challenges on both Gee and Martin.[29] Today's majority opinion does not dispute that Grant properly preserved this claim.

¶ 31 The majority opinion does assert, however, that Grant "has not shown that he was forced, over objection, to keep an unacceptable juror" and then concludes that it "need not decide" the issue of whether the trial court abused its discretion in failing to remove juror Gee.[30] In effect, the majority

---

25. *See* 22 O.S.1991, § 655 (both parties entitled to nine peremptory challenges in first-degree murder cases).

26. Oklahoma law requires a party to "cure" a wrongful denial of a for-cause challenge through the use of a peremptory challenge. *See Ross v. Oklahoma*, 487 U.S. 81, 89, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988) (recognizing "long settled principle of Oklahoma law that a defendant who disagrees with the trial court's ruling on a for-cause challenge must, in order to preserve the claim ..., exercise a peremptory challenge to remove the juror") (citing cases).

27. *See id.* at 88 ("[W]e reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury."); *id.* at 89 ("[T]he 'right' to peremptory challenges is 'denied or impaired' only if the defendant does not receive that which state law provides.").

28. *See Hawkins v. State*, 1986 OK CR 58, 717 P.2d 1156, 1158 ("The long standing rule in Oklahoma is that an improper denial of a challenge for cause will not be prejudicial unless it can be affirmatively shown in the record that the erroneous ruling reduced the number of the appellant's peremptory challenges to his preju-

dice.... In order to show prejudice, the appellant must demonstrate that he was forced, over objection, to keep an unacceptable juror.") (citations omitted); *Thompson v. State*, 1974 OK CR 15, 519 P.2d 538, 541 (reversing conviction where defendant had to use peremptory challenge to remove juror who should have been removed for cause "and was thereby precluded from removing a prospective juror from the panel, whom he considered to be undesirable to his position"); *see also Warner v. State*, 2001 OK CR 11, 29 P.3d 569, 573–74 (quoting *Hawkins*); *Powell v. State*, 1995 OK CR 37, 906 P.2d 765, 772, *cert. denied*, 517 U.S. 1144, 116 S.Ct. 1438, 134 L.Ed.2d 560 (1996); *Brown v. State*, 1987 OK CR 181, 743 P.2d 133, 139.

29. *See Salazar v. State*, 1996 OK CR 25, 919 P.2d 1120, 1128; *Cannon v. State*, 1995 OK CR 45, 904 P.2d 89, 98, *cert. denied*, 516 U.S. 1176, 116 S.Ct. 1272, 134 L.Ed.2d 219 (1996); *Patton v. State*, 1998 OK CR 66, 973 P.2d 270, 283, *cert. denied*, 528 U.S. 939, 120 S.Ct. 347, 145 L.Ed.2d 271 (1999).

30. I agree with the majority opinion that whether juror Gee should have been struck for cause is the "harder issue," since juror Martin, unlike

opinion finds that because Grant has not shown "prejudice" from the district court's refusal to remove Gee for cause, it need not decide whether the district court abused its discretion in refusing to strike Gee. The majority opinion reflects a fundamental misunderstanding of the applicable legal standards for evaluating Grant's claim, as well as the nature and purpose of peremptory challenges within a criminal trial.

¶ 32 This Court has repeatedly held that "prejudice" in this context is established by showing that the defendant was injured by the trial court's improper denial of his for-cause challenge, because he was forced to use a peremptory challenge to get rid of the biased juror, which would otherwise have been available to strike another potential juror that the defendant considered "unacceptable" or "undesirable." [31] The central purpose of peremptory challenges is to allow parties to remove from the jury persons that they do not believe will be sympathetic to their position, even though the potential jurors do not meet the stringent legal standards of being "biased" and thereby removable for cause. The majority opinion notes that "Grant never sought to have Hargrave

removed for cause." This statement is accurate, but irrelevant.

¶ 33 Grant's claim is not that Hargrave was removable for cause, but that she was an "undesirable juror" that he could have removed with the last of his nine peremptory challenges, if he had not been forced to use a peremptory challenge to remove juror Gee (who should have been struck for cause).[32] It is also irrelevant that Grant chose to use his available peremptory challenges to strike jurors other than Hargrave and that he likewise did not challenge these other potential jurors for cause. Again, the majority seems to forget that the heart of Grant's claim is that he was denied the use of all of his statutory peremptory challenges, the purpose of which is to allow him to remove persons from the jury that seem "undesirable," but who would *not* otherwise be removable for cause.

¶ 34 It does not matter that Grant chose to strike persons other than Hargrave; nor does it matter that none of the persons that he struck through peremptory challenges (with the exception of juror Gee) were removable for cause. We have never previous-

---

juror Gee, was ultimately quite clear that he would consider all three sentencing options (despite his initial statements that he would not consider any sentence less than life without parole for someone who committed an intentional murder). Because the loss of even one statutory peremptory challenge can entitle a defendant to relief, however, Grant only needs to show that juror Gee should have been struck for cause. Thus I will not further address Grant's claim in regard to Martin.

31. *See* cases cited *supra* in note 28. Today's majority opinion initially articulates Grant's claim about the prejudicial loss of a peremptory challenge correctly, but later confuses it with an entirely different claim (which Grant does not make) that the jury that actually decided his case was biased, because it contained one or more persons that should have been struck for cause. Hence today's majority opinion incorrectly states that Grant is required to show "that the jury sitting in the trial was not impartial" and later concludes that Grant is not entitled to relief because "he has not shown that the jury was prejudiced against him."

The opinion cites *Abshier v. State*, 2001 OK CR 13, 28 P.3d 579, *cert. denied*, 535 U.S. 991, 122 S.Ct. 1548, 152 L.Ed.2d 472 (2002), in support of this purported requirement. Yet in *Abshier*, unlike in the current case, the court majority affir-

matively found that the challenged juror was not removable for cause. *Id.* at 603. Today's majority neglects to decide whether Gee should have been removed for cause. In addition, because the *Abshier* majority found that the trial court correctly denied the defendant's challenge for cause, the opinion's additional analysis about whether the defendant could have been "prejudiced" by the trial court's action is mere dicta. *Id.* at 603–04. I dissented from *Abshier* and specifically noted the error within the opinion's prejudice analysis. *See id.* at 617 (Chapel, J., dissenting).

The dicta of *Abshier* did not change the "long standing rule in Oklahoma," as articulated in *Hawkins* and its progeny, for establishing prejudice in this context. *See* cases cited *supra* in note 28. Grant is not required to show that the jury that decided his case was not impartial.

32. During voir dire juror Hargrave initially stated that she would automatically give the death penalty if she found that a person had committed first-degree murder. Although she was later rehabilitated, her initial "untutored" statements surely were enough to make her undesirable/unacceptable from Grant's perspective. The majority opinion does not deny that Hargrave was an "undesirable" or "unacceptable" juror from Grant's perspective.

ly required that a claimant in this context show anything more than that he used up all of his peremptory challenges and that he was still left with an "undesirable" juror; and we have never questioned a defendant's right to choose to strike one undesirable juror over another.[33] To demand some further showing to establish "prejudice" in this context is unfair, unreasonable, and corruptive of the very concept of peremptory challenges.

¶ 35 Although the majority fails to determine whether the trial court abused its discretion in failing to strike juror Gee for cause, I address the issue herein in order to show that Grant should have been granted a resentencing on this jury selection claim, as well as on the ineffective assistance claim addressed above.

¶ 36 The standard for evaluating whether a potential capital juror should be excused for cause based upon the juror's views on punishment is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' "[34] It is well established that a juror who will automatically vote for the death penalty should be excused for cause.[35] Yet even jurors who do not clearly state that they will "automatically" vote for the death penalty may be biased in regard to sentencing, such that they should not be allowed to serve, and such bias need not be established with "unmistakable clarity."[36] As the Supreme Court has noted, "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistak-

ably clear.' "[37] Our Court has likewise recently reaffirmed that " 'all doubts regarding juror impartiality must be resolved in favor of the accused,' " and that this " 'rule is intended to apply to both the trial courts and the Court of Criminal Appeals.' "[38]

¶ 37 Grant sought and was granted individual sequestered voir dire on the issue of potential jurors' ability to consider all three sentencing options for first-degree murder, and all of the prospective jurors were questioned extensively regarding their views on punishment. The key questioning of Gee (and many other prospective jurors) centered around the issue of whether he believed that all premeditated murder deserved the death penalty. During his initial questioning, Gee indicated at least six times that, in his opinion, anyone who commits premeditated murder should get the death penalty. On the other hand, Gee also maintained that he would not "automatically" give the death penalty for first-degree murder and that he would consider the sentences of life imprisonment and life without parole. Grant challenged Gee for cause at the conclusion of his initial questioning. The trial court denied this challenge, finding that Gee seemed confused.

¶ 38 During subsequent questioning the prosecutor explained that premeditation sufficient to constitute first-degree murder can be formed in an instant and summarized the type of aggravating and mitigating evidence that could be put on during the sentencing stage of a capital trial. After Gee then re-

**33.** *See, e.g., Thompson,* 519 P.2d at 539–41; *Salazar,* 919 P.2d at 1128; *Patton,* 973 P.2d at 283.

**34.** *See Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)); *see also Warner,* 29 P.3d at 573 (quoting *Wainwright* ); *Williams v. State,* 2001 OK CR 9, 22 P.3d 702, 709, *cert denied,* ——— U.S. ———, 122 S.Ct. 836, 151 L.Ed.2d 716 (2002).

**35.** *See Morgan v. Illinois,* 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) (juror that will automatically give death sentence is not impartial, and death sentence imposed by jury containing even one such juror cannot be executed); *see also Cannon,* 904 P.2d at 97 ("A criminal defendant has a right to remove for cause any juror who would automatically vote for the death

penalty on conviction regardless of mitigating evidence.").

**36.** *See Wainwright,* 469 U.S. at 424, 105 S.Ct. 844; *see also Warner,* 29 P.3d at 573 (quoting *Wainwright* ).

**37.** *See Wainwright,* 469 U.S. at 425, 105 S.Ct. 844. Our Court has recently noted that jurors must be "willing to go into the trial with no preconceived notions regarding the appropriate penalty, death or life," and that jurors with a "strong bias towards the death penalty" are not impartial and should be excused for cause. *See Warner,* 29 P.3d at 573.

**38.** *See Warner,* 29 P.3d at 572 (quoting *Hawkins,* 717 P.2d at 1158).

asserted that he would follow the court's instructions and consider all three sentencing options, the State maintained that Gee was "rehabilitated" and that he had simply been confused.

¶ 39 Defense counsel then began re-questioning Gee, and the following exchange occurred:

> Counsel: Let's pretend that you have already found Mr. Grant guilty. You heard all of the evidence and you found him guilty. You are convinced beyond a reasonable doubt that he's guilty of First Degree Murder, okay?
>
> Gee: (Nodded head.)
>
> Counsel: You got that?
>
> Gee: Uh-huh.
>
> Counsel: And part of that is that the State, part of that idea is that the State has proven to you that he intended to kill this woman, that he either thought about it for days or he just thought about it and did it, but he intended to kill this woman for no good reason. Okay?
>
> Gee: (Nodded head.)
>
> Counsel: Without hearing another thing, would you automatically give him the death penalty?
>
> Gee: Now, I am going to have to think about.
>
> Counsel: Okay. Think about it.
>
> Gee: I'll have to think about that one.
>
> Counsel: Think about it and give me your answer.
>
> Gee: Yes.
>
> Counsel: Yes you would?
>
> Gee: Yes.
>
> Counsel: Now, what if the Judge gave you other instructions that that happened—
>
> Gee: I would go by his instructions.

From that point on Gee maintained that he would follow the Court's instructions, and defense counsel's questioning concluded as follows:

> Counsel: Okay. So even though you were convinced that Mr. Grant here murdered somebody and intended to do that, it was not an accident or anything, intended to kill them and killed them, you would consider, you would follow the Court's instructions and consider giving him something less than the death penalty?
>
> Gee: If the Court ordered, if the Court has asked us to do that.

¶ 40 Defense counsel renewed his challenge for cause, but the trial court denied it, stating, "And that request will be denied. As I stated when we started this re-questioning[,] I think he was confused and I think that he cleared that up. Now [he] fully understands what he's talking about." Gee then volunteered that he was "nervous" and that he "just lived out in the country too long, I guess." When the court asked if he felt like he now understood, Gee answered, "I think I understand it now. I got confused there for a while and I think I understand it. I'll go in there and weigh both sides and give it my best shot. That's all I can do." The trial court agreed, and Gee was returned to the jury box.

¶ 41 Whether Gee was biased in favor of the death penalty such that the district court should have struck him for cause is a close call. Even though Gee consistently maintained that he would follow the trial court's instructions and consider all three sentencing options, he also repeatedly and emphatically stated that, in his opinion, anyone who committed premeditated/intentional murder should get the death penalty. In *Morgan v. Illinois*,[39] the Supreme Court discussed the problem of prospective jurors who sincerely intend to follow whatever instructions the court gives them, but who likewise sincerely believe that anyone who commits first-degree murder should get the death penalty: "It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so."[40] The *Morgan* Court recognized that persons who function under this "misconception" should not be al-

---

**39.** 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).

**40.** *Id.* at 735, 112 S.Ct. 2222.

lowed to serve.[41]

¶ 42 It appears quite possible that Gee was a juror of this type. He repeatedly admitted that he was confused; and even at the conclusion of his extensive questioning, he does not appear to have understood that his stated belief that the death penalty was the only appropriate penalty for a premeditated murder was inconsistent with his promise to follow whatever the Court ordered the jury to do.

¶ 43 Although the questioning of Gee did not make it "unmistakably clear" that he would be biased in favor of the death penalty, this kind of certainty is not required in this context. I conclude that Gee's repeated assertion that the death penalty is the only appropriate sentence for a premeditated murder should have been adequate to cause the district court to strike Gee for cause. While I acknowledge that the question of whether the district court abused its discretion by refusing to strike Gee is a close call, this Court should abide by its prior holdings that doubts regarding juror impartiality should be resolved in favor of the accused. There was good reason to doubt Gee's impartiality regarding sentencing, and Grant should not have been forced to use a peremptory challenge to keep Gee off his jury.

¶ 44 Thus Grant has established (1) that he was required to use a peremptory challenge to remove a juror who should have been struck for cause, (2) that he used all of his remaining peremptory challenges, and (3) that an undesirable juror was left on his jury panel. Consequently, Grant is entitled to relief on his jury selection claim, as well as on the ineffective assistance claim addressed above. Because both of these claims relate only to the jury's sentencing determination, however, they do not affect the legitimacy of Grant's first-degree murder conviction.[42] Although I agree with today's majority that Grant's murder conviction should be affirmed, I dissent from the Court's opinion and its refusal to provide Grant with a new capital sentencing proceeding. I conclude that Grant has established that he is entitled to sentencing relief based upon both his second-stage ineffective assistance claim and his jury selection claim, both individually and through their cumulative effect upon the sentencing stage of his capital trial.

---

**41.** *Id.* at 735–36, 112 S.Ct. 2222.

**42.** Grant's challenge to Gee only involved bias in regard to the penalty stage of trial. Hence the remedy for the district court's failure to remove

Gee for cause is to remand the case for a new sentencing proceeding. *See Salazar,* 919 P.2d at 1127–20.